Filed 12/3/13  Domingo Villas v. The Ryan Firm CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DOMINGO VILLAS INC., et al., | |
| Plaintiffs and Respondents, | G047499 |
| v. | (Super. Ct. No. 30-2011-00484245) |
| THE RYAN FIRM et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Frederick P. Horn, Judge.  Reversed with directions.

The Ryan Firm, Timothy M. Ryan and Michael W. Stoltzman, Jr., for Defendants and Appellants.

Law Offices of Gregory S. Page and Gregory S. Page for Plaintiffs and Respondents.

\*          \*          \*

# I.  INTRODUCTION

As Justice Crosby wrote for this court two decades ago, "the public policy of this state is not served by permitting attorneys to sue one another for omissions or representations made as officers of the court during the course of litigation." (*Pollock v. Superior Court* (1991) 229 Cal.App.3d 26, 29.)  At its core, this appeal centers on precisely that.  One party, the plaintiff, seeks to hold the attorneys for the other party responsible for an aggressive interpretation of a set of loan documents which formed part of the basis of the defendant's claim for damages in a previously filed complaint for *judicial* foreclosure.

All the claims against the attorneys arose from protected activity under the anti-SLAPP statute, because they all originated from the legal advice given in the context of the judicial foreclosure action which was then immediately manifested in the claim for damages in the complaint in that action.[1]  Even claims that might be incidentally linked to the attorneys' improvident decision to allow themselves to be substituted in as the trustee in their client's deed of trust *still* trace their way back to the legal advice they gave in preparation for the filing of the judicial foreclosure action.

And, as to step two in the anti-SLAPP analysis – whether the plaintiff has carried its burden of showing minimal merit for its various causes of action – we determine as follows:  To the degree plaintiff's causes of action do not squarely fall within the absolute litigation privilege of Civil Code section 47, subdivision (b), they fall within the qualified common interest privilege of Civil Code section 47, subdivision (c)(1).[2]  But even if those causes of action are only covered by a qualified privilege, the plaintiff cannot prevail.  The plaintiff failed to carry its burden of showing sufficient prima facie evidence of malice to defeat the privilege.  The attorneys' anti-SLAPP

---

[1]      Code of Civil Procedure section 425.16.

[2]      Any undesignated statutory section in this opinion is to the Civil Code.  The statute being referred to in any unreferenced subdivision will be obvious from the context of the discussion.

2

motion should therefore have been granted.  We reverse the denial order and direct entry of judgment on behalf of the defendant attorneys.

## II.  FACTS

A.  *Preliminary Observations*

This case is a dispute over the amount due under a series of loan documents.  The parties are: (1) borrower Domingo Villas; (2) lender Troy; and (3) the lender's attorneys, Ryan Firm.[3]  We take our facts mostly from Domingo Villas' second amended complaint, including the text of a certain "Extension Agreement" that is at the root of its claims against Ryan Firm.  The balance we take from Ryan Firm's anti-SLAPP suit motion to dismiss the causes of action against it.  Ironically, if one adjusts for the multitude of conclusory allegations in the second amended complaint to the effect everything Ryan Firm has done has been done with malice, there is almost no room for factual dispute in the narrative.

There is the threshold problem, though, of how to discuss the actual merits of the loan dispute between Domingo Villas and Troy.  It is still early days as far as that dispute is concerned, and the record has not sufficiently developed to permit resolution of the dispute.  So we issue this caveat:  We are forced to reach the issue of whether Ryan Firm's interpretation of the loan documents – in particular a certain "Extension Agreement" – is so unreasonable that the interpretation itself might serve as prima facie evidence of maliciousness.  But we are not forced to go beyond that issue.  This opinion

---

[3]    We refer to the plaintiff borrower Domingo Villas, Inc. as Domingo Villas – the "Villas" highlights its role as the owner of a Newport Beach apartment complex.  The lender defendant is, technically, Rick Tarnutzer, individually and as Trustee of the 1997 Troy Trust, as amended and restated.  We will refer to the defendant as either "Troy" or in some cases "lender Troy," because the trust in "Troy Trust" can get confusing given this case in part concerns the operation of a trust deed given by Domingo Villas to the Troy Trust.  (Troy Trust is technically the *beneficiary* of a deed of trust in the underlying loan transaction.)  We sometimes refer to Troy as "lender Troy" to periodically remind readers this case really is, at heart, a dispute between a lender and a borrower.  The complaint also names two ancillary attorney defendants:  The Ryan Firm – its official name – and the firm's principal attorney Timothy M. Ryan.  We will refer to them collectively as Ryan Firm, to emphasize the fact it is attorneys who are being sued.  We will omit the "The" in the firm's name because the extra article makes referring to it cumbersome.

should not be read as preempting the merits of the loan dispute between Domingo Villas and Troy. Either one could end up as the prevailing party.

B. *Background to the Extension Agreement*

In early May 2007, Domingo Villas owned an eight-unit apartment building in Newport Beach that it hoped to convert into condominium units. It also wanted to refinance the building, so it entered into a loan with Troy for $2.6 million at a 10 percent interest rate. The loan was guaranteed by two principals of Domingo Villas, Walter Mitchell and David Chamberlain, though Mitchell would later transfer all his interest in Domingo Villas to Chamberlain. (Hence Chamberlain and Domingo Villas, but not Mitchell, appear as plaintiffs in this action.) The loan involved Domingo Villas giving a deed of trust with a trustee's power of sale to Troy.

The note evidencing the loan had a maturity date of May 2, 2008. It allegedly provided for a six-month extension, but at a 13 percent interest rate. As the loan was coming due, rather than simply pay 13 percent for six months, Domingo Villas entered into a "First Amendment" of the loan, accepted by Troy, effective May 2, 2008.

C. *The Extension Agreement*

In July of 2009, Chamberlain and Troy – but we note *not* Domingo Villas – entered into an "Extension Agreement." Chamberlain did not sign in any capacity as a principal of Domingo Villas but only as "an individual as Guarantor." For the sake of our analysis ahead, we need to stop and recount several of the provisions of this Extension Agreement.

The agreement recites that the note was already in default, thus Troy was intending to immediately institute a nonjudicial foreclosure action. Further, that action was to be "continuously" processed "to its completion."

The agreement also recited that because Chamberlain "has personally guaranteed the Loan," he was "entering into this Agreement to forestall any legal action on his Personal Guarantee relating to the default of the Loan, including but not limited to

4

failure to make interest payments, late fees, payments of the Property Taxes and payments for Homeowner's Dues and assessments."

The agreement then provided that Chamberlain was going to make $100,000 a month payments "until the date of the Trustee's Sale of the Property or otherwise set forth herein." Failure to make the $100,000 a month payments would result in a late fee. The clause referring to credit for the payments stated: "All payments made by Chamberlain to Troy pursuant to this Agreement shall be credited against any liability owed by Chamberlain in connection with his Personal Guarantee of the Note including but not limited to crediting the Initial $100,000 Payment, the future $100,000 payments and" and the earlier $32,500 Payment for extension of the maturity date.

Troy was not only going to proceed with a foreclosure, but it also agreed to make a full credit bid at the foreclosure sale for the entire amount it was owed "in connection with Note, including but not limited to all principal, interest, late fees, current taxes, past due taxes and associated penalties, late payment charges, foreclosure fees and charges and attorney's fees." Troy further promised to increase its bid by "all monies expended by Chamberlain on repairs and improvements to the Property" made "after April 1, 2009." However, Troy's bid would "not take into account any payments made by Chamberlain in his capacity as Guarantor to Troy as provided for in this Agreement."

The agreement then provided that if Troy was "successful with its credit bid at the Trustee's sale," Troy would then turn around and sell the property to Chamberlain for $1.5 million "cash." (Chamberlain had the right to pay a higher price if he wanted to, but that seems unlikely.)

Troy's promise to sell the property to Chamberlain, however, was subject to certain terms and conditions. These conditions included that Chamberlain would both make all the $100,000 payments and that he would pay Troy "all sums due under the Note." However, the purchase price Chamberlain paid for the property was to "be deducted from said sums due under the Domingo Note."

5

The contemplated sale to Chamberlain was to take place within 90 calendar days of the foreclosure sale, during which Chamberlain was to continue making the monthly $100,000 payments. If Chamberlain didn't purchase the property and close escrow within those 90 days, he could extend that 90 days by paying $110,000 a month. If, on the other hand, Chamberlain didn't buy the property within 90 days or extend the time in which to do so, he would have no further obligation to make any further payments to Troy, and Troy would have no obligation to sell the property to him. In that event, the agreement was to "expire and be null and void and all monies paid to Troy pursuant to this Agreement [would] be retained by Troy." In such an event Troy was at liberty to "commence a law suit to collect all deficiencies under the Note from Chamberlain on his Personal Guarantee."

On the other hand, if Troy was not successful in making "its credit bid at the Trustee's sale and the Property [was] not transferred to Troy but to a third party," then – and only then – all the "payments made by Chamberlain to Troy pursuant to this Agreement [would] be refunded to Chamberlain" – plus interest at the same rate he paid. Troy would get to keep any "overage from the foreclosure sale."

Under the specific heading "Personal Guarantee," the agreement provided: "On the condition that Chamberlain performs and acts in substantial accordance and compliance with this Agreement, then Troy agrees that Troy will not take any action on the Personal Guarantees executed by Chamberlain and Mitchell including but not limited to filing legal actions against Chamberlain and Mitchell and shall resort only to a non-judicial foreclosure action against the Property." Also, "in consideration of the payments made by Chamberlain pursuant to this Agreement, Troy agree[d] to refrain from taking any actions that would impair, restrict or inhibit Chamberlain's ability to purchase the Property." In fact, Troy would "use its best efforts to aid Chamberlain, at no cost or liability to Troy, to acquire the Property." Moreover, in this everything-goes-as-hoped-for scenario in which Chamberlain would end up purchasing the property, Troy promised

6

to "return the Personal Guarantees back to Chamberlain and Mitchell and provide an accounting of monies received in satisfaction of the Personal Guarantees." The agreement finally stated that it would not modify Chamberlain's personal guarantee "in any way." Chamberlain's guarantee would "remain in full force and effect."

D. *Aftermath of Extension Agreement and Ensuing Litigation*

The second amended complaint alleges that Chamberlain paid some $1.557 million in payments from July 22, 2009 (the date he signed the Extension Agreement) to January 27, 2011. As February approached, Domingo Villas was trying to arrange a loan to pay off the existing Troy loan, and thought $1.5 million would cover it. It had lined up at least two potential lenders – one not named in the second amended complaint and Chase Bank. But Troy submitted a demand statement for $2,098,422. According to Domingo Villas, the $2,098,422 overstated Domingo Villas' true indebtedness by about half a million dollars, through such devices as using a 13 percent interest rate, not giving Domingo Villas credit for certain payments, asserting a penalty for late payoff, tacking on late fees for some payments, and additionally assessing legal and accounting fees. On top of that, Troy further claimed the loan had already been in default for about two years (since May 2009), thus allowing assessment of a 13 percent interest rate. The next month, March 2011, Troy's CPA upped the default ante by asserting the loan had been in default since December *2007*, on the theory that Domingo hadn't paid property taxes. (The net effect of the assertion was a further argument that 13 percent was the appropriate interest rate.)

It is important at this point in the narrative to stop and recognize that at this point – March 2011 – there is no allegation that Ryan Firm had anything to do with Troy. Ryan Firm makes its first appearance chronologically in the complaint on April 1, 2011. By that day, according to the second amended complaint, Ryan Firm had been retained as Troy's new legal counsel and had ("intentionally, fraudulently maliciously, and oppressively") figured out a way to calculate the loan balance so as to not give Domingo

7

Villas' credit for the $1.557 million in payments made by Chamberlain.  Ryan Firm's interpretation of the loan documents had the effect of inflating the amount supposedly due from Domingo Villas from the already inflated $2.1 million which Troy had been claiming to a whopping $3,492,403.54.

The uncontroverted evidence submitted by Ryan Firm in support of its anti-SLAPP motion shows that Ryan Firm was formally retained by Troy on April 1, 2011. Ryan Firm's duties as part of the retention included interpreting the relevant loan documents to ascertain the proper amount due.  Accordingly, on April 7, 2011, six days after the retention, Ryan Firm filed on Troy's behalf a complaint for *judicial* foreclosure seeking, among other things, appointment of a receiver, foreclosure of the deed of trust, and damages of $3,492,403.54.[4]  The roughly $3.5 million sought in damages in the complaint for judicial foreclosure was stated in the judicial foreclosure complaint itself to be a product of Troy's position that Domingo Villas should not receive credit for the payments made by Chamberlain.

According to the second amended complaint, on April 8, 2011 – a mere day after the institution of the judicial foreclosure action – Ryan Firm itself was formally substituted in as the trustee of the deed of trust originally given by Domingo Villas back in 2007 when it got the loan.[5]  The substitution was formally recorded on April 12, 2011, and the next day, April 13, 2011, Ryan Firm recorded a notice of default asserting $3,503,056.48 was due and owing.  Fifteen days after that, on April 28, 2011, Ryan Firm recorded a notice of rescission of the earlier notice and at the same time recorded a new notice of default asserting $3,517,602.96 as the new amount due.  The second amended complaint alleges that the intent of these notices of default was to prevent Domingo

---

4  Orange County Superior Court case number 30-2011-00464351.

5  Such a move – an attorney for a lender subbing herself in as trustee in a deed of trust – is not as counterintuitive or as uncommon as one might at first think.  (See Mattingly, *The Shift from Power to Process:  A Functional Approach to Foreclosure Law* (1996) 80 Marq. L. Rev. 77, 87, fn. 42 ["The attorney representing the foreclosing lender is often appointed by the lender as the trustee or substitute trustee and, in such capacity, conducts the foreclosure sale."].)

Villas from selling the property because Troy coveted the property for its own conversion project.

Even though the judicial foreclosure action was still pending at the time – in fact, it's still pending now – on August 3, 2011, Ryan Firm, as trustee of the deed of trust, recorded a notice of trustee's sale, scheduling the sale for September 2, 2011. The document states the amount due under the note secured by the deed of trust was $3,580,969.21.

Domingo Villas filed for chapter 11 bankruptcy one day before the scheduled nonjudicial foreclosure. By mid-November 2011 the bankruptcy court approved the sale of the property to a third party for $2.9 million.[6] Of that amount, $2.6 million was paid into a debtor-in-possession account pending the outcome of the case before us.

From the foregoing narrative of events Domingo Villas has spun these causes of action against Ryan Firm:

– *Cause of action number 3, for declaratory relief,* based on the basic disagreement between Domingo Villas and Troy over how to interpret the relevant loan documents. Ryan Firm's role is alleged to be that it maliciously conspired with Troy to fabricate a legal pretext on which Troy could overstate the balance due.

– *Cause of action number 4, for intentional interference with prospective economic advantage.* The theory here is that Troy's assertions of an inflated balance due scared off potential refinance lenders in 2011, including Chase Bank. Ryan Firm's role appears to be, once again, that it maliciously figured out a way to assert inflated amounts due.

---

[6]     The second amended complaint contains numerous allegations complaining of Ryan Firm's litigation tactics in the bankruptcy court, but these are so obviously a product of litigation and covered by the absolute litigation privilege of Civil Code section 47, subdivision (b) – and Domingo Villas does not seriously contend otherwise – that they are not worth even alluding to, except in this footnote.

9

– *Cause of action number 8, for negligence*.  The theory here is that Ryan Firm negligently misinterpreted the terms of the loan documents, in particular the Extension Agreement.

– *Cause of action number 9, for violation of Civil Code sections 2924 and 2924f.*  This cause of action centers on the publishing of the notices of default and the subsequent initiation of nonjudicial foreclosure proceedings based on inflated amounts due.  Ryan Firm's role here was the trustee was in preparing and recording the notices of default.

– *Cause of action number 10, for conspiring to do all the things alleged in cause of action number 9 that violated Civil Code sections 2924 and 2924f.*

– *Cause of action number 11, for slander of title*, based on the publication and recordation of the notices of default which inflated the amount due and the ensuing initiation of nonjudicial foreclosure proceedings.  The theory here is that Ryan Firm, by filing notices of default stating inflated amounts due, was helping Troy to grab title of the apartment building for itself.

– *Cause of action number 12, for intentional infliction of emotional distress*, based on Ryan Firm's conspiracy with Troy to oppress Chamberlain by maliciously taking the position that Domingo Villas should not get credit for his payments on its behalf.

Domingo Villas' second amended complaint contains a disclaimer (at paragraph 61) that any references to any judicial proceeding in it are only "incidental to the causes of action . . . based essentially on non-protected activity."[7]

Ryan Firm brought an anti-SLAPP motion.  The motion was denied.  In its website posting, the trial court gave several reasons for its denial:  On April 11, Ryan

---

7       Ryan Firm's comment about the effect of this disclaimer is that it is worthless, the equivalent of Domingo Villas saying, "'Who are you going to believe, us or your lying eyes?'"  We will simply note that in this opinion we look to substance over form, and the substance is that Ryan Firm is being sued for its advice to an opposing party.

10

Firm had recorded a notice of default "in their capacity as trustee on the deed of trust and that that notice indicated that $3,503,056.48 was due on the loan, which was an amount considerably higher than the $2,098,422 that was previously asserted to be due." The court also relied on the allegation that Ryan Firm and Troy Trust "purposely inflated the amount owed 'based on an improper motive and pursuant to a conspiracy to improperly foreclose on the Subject Property and/or to improperly acquire title from plaintiff Domingo." Further, the court noted the allegation that Ryan Firm, as trustee, recorded a notice of trustee's sale that also reflected a default amount of $3,580,969.21, and further took account of allegations that Troy Trust itself was in some financial distress at the time, and had a motive to make "excessive pay-off demands." The court then concluded (citing *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 339, and *Garretson v. Post* (2007) 156 Cal.App.4th 1508) that because Ryan Firm's "actions" were "taken in their capacity as the trustee of the deed of trust in the nonjudicial foreclosure proceedings," the lawsuit against Ryan Firm did not arise out of "'protected activity'" as defined in the anti-SLAPP statute. From the order denying the motion Ryan Firm has filed this appeal.

## III. DISCUSSION

Analysis of anti-SLAPP motions involves two distinct steps. Step one centers around the words "arises from" in ascertaining whether a cause of action triggers the protections of the statute.[8] In ascertaining whether a cause of action "arises from" protected activity, the court asks whether the cause of action is *based on* protected activity, and "based on" is defined as whether the defendant's *act underlying* the cause of action was in furtherance of the protected activity. (*Peregrine Funding, Inc. v. Sheppard*

_____

[8] Code of Civil Procedure section 425.16, subdivision (b)(1) provides: "A cause of action against a person *arising from any act* of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Italics added.)

11

*Mullin Richter & Hampton* (2005) 133 Cal.App.4th 658, 670, citing and quoting *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

A problem arises when a cause of action may be said to be based on both protected and unprotected activity. If that is the case, the cause of action *is* protected by the anti-SLAPP statute, the only exception being if the allegations of protected activity are "'merely incidental'" to the unprotected activity. (See *Peregrine Funding, supra,* 133 Cal.App.4th at p. 672.) Another way of stating that is to ask whether the "gravamen" or "principal thrust" of a cause of action alleges conduct protected by the anti-SLAPP statute. In ascertaining the gravamen or principal thrust of a cause of action, the court should pinpoint the injury-producing conduct that underlies the cause of action. (See *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 272.)

If step one is satisfied, step two is to ask whether the *plaintiff* has carried its burden of showing minimal merit for the cause of action. (*Peregrine Funding, supra*, 133 Cal.App.4th at p. 675.)

A. *Step One: All Causes of Action Here Are Based on the Interpretation of Contract Documents First Asserted in the Complaint for Judicial Foreclosure*

As far as step one is concerned, the salient fact in this case is that the injury-producing conduct *all* originates in Ryan Firm's interpretation of the relevant loan documents, particularly the Extension Agreement which it reads to preclude Domingo Villas from getting credit for Chamberlain's payments. That interpretation was developed in connection with Troy's complaint for judicial foreclosure filed April 7, 2011. If one takes the time to deconstruct the second amended complaint and lay it alongside the evidence of Ryan Firm's preparation of the judicial foreclosure action, the connection is clear. Ryan Firm was retained April 1, and filed a complaint on behalf of its client less than a week later, on April 7. It was the complaint in the civil action for judicial foreclosure which *first* asserted a balance due of $3.5 million, which assertion was necessarily predicated on a reading of the Extension Agreement by which Domingo

12

Villas would not receive credit for Chamberlain's payments of $100,000 a month. Ryan Firm's subsequent actions as trustee in publishing notices of default, or in recording a notice of trustee's sale, merely repeated the result of a legal theory which was first asserted in the claim for damages in the complaint for judicial foreclosure. Ryan Firm has been sued for its legal theory bearing on the Extension Agreement, not for, say, fouling up the paperwork in the process of recording notices of default or trustee's sale.

We may take it as a given that legal advice given in connection with the preparation of a complaint for *judicial* foreclosure, as distinct from nonjudicial foreclosure, is protected by the anti-SLAPP statute, because judicial foreclosure involves a civil action with oversight by a court. (See *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1236.) It is also established that a lawyer's furnishing of legal advice in connection with litigation is protected activity within the purview of the statute. (See *Thayer v. Kabateck Brown Kellner LLP* (2012) 207 Cal.App.4th 141, 154 ["legal advice and settlement made in connection with litigation are within section 425.16, and may protect defendant attorneys from suits brought by third parties on any legal theory or cause of action 'arising from' those protected activities"].)

But we understand how the trial court might have been led astray on this point. If one reads only the (roughly half-inch thick, 79-page not including exhibits) second amended complaint straight through, one might never see the close connection between Ryan Firm's legal advice given in the context of the preparation of a complaint for judicial foreclosure, and the interpretation of the Extension Agreement that resulted in Troy's assertion of an amount due of $3.5 million. The judicial foreclosure action is not

13

mentioned in the second amended complaint, or, if it is, it is mentioned so obliquely that one can easily read right over it.[9]

Further, the second amended complaint is so constructed as to leave the reader with the sense that Ryan Firm was involved in interpreting the loan documents long prior to April 1. One has to look at Ryan Firm's motion to see that the firm was retained April 1. All the putatively oppressive interpretations of the loan documents about which Domingo Villas complains (the bits and pieces making up the assertion of roughly $2.1 million in the balance due as it stood in March 2011) were "asserted" prior to Ryan Firm's arrival. On top of that, the second amended complaint does nothing to isolate any action Ryan Firm might have taken in its role as trustee from its interpretation of the loan documents.

We recognize, of course, that the actions of trustees *qua* trustees are not protected activity within the anti-SLAPP statute. (See *Garretson, supra,* 156 Cal.App.4th at p. 1524 [Legislature did not intend anti-SLAPP statute to intend to "purely private transactions," including nonjudicial foreclosure ].) And the trial court grounded its denial of Ryan Firm's motion on the fact Ryan Firm had been substituted in as a trustee. But all the allegedly "injury-producing" conduct is unrelated to any dereliction by Ryan Firm *qua* trustee. As we said, Ryan Firm is not being sued for some mistake in the physical process of recording various notices at the county recorder's office. The *gravamen* and *principal thrust* of Domingo Villas' claims all trace their way back to the interpretation of the Extension Agreement made by Ryan Firm *qua* plaintiff's counsel in the judicial foreclosure action.

---

9    Paragraphs 49 and 50 of the second amended complaint are fairly good examples of obscuring the fact Ryan Firm filed a judicial foreclosure action on April 7. Paragraph 49 begins by saying that on April 7, Troy "asserted the right to non-judicially foreclose on the Subject Property and at that time claimed the sum of $3,492,403.54 was due and owing on the Note as of April 6, 2011." Then the second amended complaint goes on to assert that on or and after April 7, Troy "by and through" Ryan Firm "claimed" an "unjustifiabl[e]" interpretation of the Extension Agreement. But what the second complaint doesn't say is that Ryan Firm was asserting that interpretation in a civil complaint for judicial foreclosure. Only the anti-SLAPP motion connects the elephant to the room.

14

That point can be clarified by asking one simple question: Just what is it that trustees do as far as calculating the balance due on a note secured by a deed of trust?

The answer is: nothing. As a matter of statute, it is the beneficiary of a deed of trust – here the *client* Troy, not Ryan Firm wearing its trustee hat – who calculates the amount due in a notice of default of a loan secured by a deed of trust. (See Civ. Code, § 2924, subdivision (a)(6) ["No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process *except when acting within the scope of authority designated by the holder of the beneficial interest*." (Italics added.)].) Case law also recognizes it's the beneficiary who figures out if there's been a default. (See *Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830 ["The statutory scheme can be briefly summarized as follows. Upon default by the trustor, *the beneficiary may declare a default and proceed with a nonjudicial foreclosure sale. . . .* " (Italics added.)].)[10]

We recognize that Ryan Firm's being substituted in as a trustee under a deed of trust created a kind of recursive loop: Ryan Firm, in its role as counsel, allegedly provided bad advice to its client, lender Troy, in the process of interpreting a set of agreements which would form the basis of a complaint for judicial foreclosure, then Ryan Firm, in its role as trustee, acted on that advice in recording notices of default and of a trustee's sale based on the allegedly bad advice it gave its client in its role as counsel. So,

---

[10]    A trustee's duties, in fact, are quite limited. As this court recently explained in *Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, "an enforceable deed of trust requires the trustee to execute only one of the following mutually exclusive duties: (1) should the trustor-debtor default on the debt, the trustee must initiate foreclosure on the property for the benefit of the beneficiary-creditor or (2) should the trustor-debtor satisfy the secured debt, the trustee must reconvey title to the real property back to the trustor-debtor, extinguishing the security device." (*Id.* at p. 508; see also *Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 819 [trustee's "'agency is a passive one, for the limited purpose of conducting a sale in the event of the trustor's default or reconveying the property upon satisfaction of the debt.'"].)

15

goes the necessary logic of the loop, Ryan Firm *must* have known the deficiencies in its interpretation of the loan documents when it filed those notices of foreclosure.[11]

But step one of the anti-SLAPP analysis is about origins, not merits. And here the origins of all of Domingo Villas' causes of action trace their way back to the legal theory, first advanced in the complaint for judicial foreclosure, that Domingo Villas was not to receive credit for Chamberlain's payments.

B. *Step Two:*

1. *the relevant privileges*

At this point, we must distinguish between no less than four statutes addressing the issue of privilege.

First is Civil Code section 47, subdivision (b), which provides for an *absolute* litigation privilege. The absolute privilege covers communications with "'some relation'" to judicial proceedings. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1193.) The absolute privilege even covers "communications with 'some relation' to an *anticipated* lawsuit." (*Id.* at p. 1194.) However, not all communications based on assertions made in lawsuits come within the privilege, the most obvious example being press conferences. (E.g., *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1138.)

Second is Civil Code section 47, subdivision (c)(1), which sets forth a *qualified* common interest privilege. The qualified common interest privilege plays a role in this case because it was the center of attention in the case which Domingo Villas mainly relies on, *Kachlon, supra*, 168 Cal.App.4th 316. *Kachlon* was not a SLAPP case at all. Its only discussion of the anti-SLAPP statute is in its passing discussion of *Garretson, supra*. But *Kachlon* was a trustee's case, where a trustee was sued for

---

11    Wearing too many hats can get you in trouble, as Pooh-Bah, Lord High Everything Else in the Mikado, forecast when he concluded that if the Lord High Executioner followed the advice Pooh-Bah gave in his role as Paymaster General to embezzle from certain accounts to pay for an upcoming wedding, Pooh-Bah would be duty bound in his role as Archbishop of the town to denounce his own dishonesty and would then have to give himself up to his own custody in his role as First Commissioner of Police.

initiating nonjudicial foreclosure proceedings based on a borrower's claim that the amount due was improperly inflated. (And in fact it was, as the opinion would go on to hold.) *Kachlon's* main point is that trustees who are sued for filing notices of default which overstate amounts due are not covered by the absolute litigation privilege of section 47, subdivision (b), but are covered by the qualified common interest privilege of section 47, subdivision (c)(1). On that point, interestingly enough, *Kachlon* parted company from *Garretson*, which had opined the absolute privilege applies to trustees. (See *Garretson, supra*, 156 Cal.App.4th at p. 1517.) Under *Kachlon*, but not under *Garretson*, trustees can be held liable for *maliciously* filing a notice of default. (*Kachlon, supra*, 168 Cal.App.4th pp. 340-341.)

Third is Civil Code section 2924, subdivision (d), which *generally* incorporates the section 47 privileges to make them applicable to trustees in deeds of trust. By its terms, section 2924, subdivision (d) covers trustees filing notices of default.[12] As explained in *Kachlon*, this general incorporation leaves an ambiguity as to whether the privilege spoken of in section 2924, subdivision (d) is absolute or qualified. (*Kachlon, supra*, 168 Cal.App.4th at pp. 338-339.) The *Kachlon* court determined in light of the ambiguity of the text and legislative history bearing on the matter, and in light of common sense, that the better reading of the subdivision (b) was to provide for only a *qualified* privilege, as provided for in section 47, subdivision (c)(1).[13]

---

[12]    The statute provides:
   "(d) All of the following shall constitute privileged communications pursuant to Section 47:
   "(1) The mailing, *publication, and delivery of notices* as required by this section.
   "(2) Performance of the procedures set forth in this article.
   "(3) Performance of the functions and procedures set forth in this article if those functions and procedures are necessary to carry out the duties described in Sections 729.040, 729.050, and 729.080 of the Code of Civil Procedure." (Italics added)
      One must note that this text of what is now subdivision (d) was in the relevant version of section 2924 as explicated by *Kachlon*, but not designated with a formal subdivision. (See *Kachlon, supra*, 168 Cal.App.4th at p. 335.) The *Kachlon* court referred to what is now subdivision (d) as the "1996 Amendment." (*Ibid.*)

[13]    In this opinion we will assume, for sake of argument but without deciding the matter ourselves, that *Kachlon* expresses the better view of section 2924, subdivision (d).

Finally, there is Civil Code section 2924, subdivision (b), which provides for a "good faith" privilege for trustees. It would be easy to misread the statute enunciating this privilege, because the literal text can be taken to mean that if a *beneficiary* provides a trustee with an amount due that has been calculated in bad faith, the *trustee* can be sued.[14] Indeed, that was how the borrowers (the beneficiaries of the deed of trust in that case) asked the court in *Kachlon* to read the statute. (See *Kachlon, supra*, 168 Cal.App.4th at p. 342.) However, the *Kachlon* court rejected such a reading, in the process explaining the legislative history of subdivision (b) "definitely" showed that subdivision (b) was an "*expansion*" of the *immunity* already provided in subdivision (d). It was the California Trustee's Association who sponsored the bill that created subdivision (b), and the purpose of the legislation was to give trustees immunity for good faith reliance on the numbers supplied by beneficiaries. (See *id*. at pp. 342-343.) Illustrating that the subdivision (b) privilege does not make trustees dependent on the good faith of beneficiaries, the *Kachlon* court upheld trial court rulings that exonerated the trustee because of an absence of malice while at the same time pinning liability on the beneficiary for its maliciousness. (*Id*. at pp. 343-345.)

2. *application*

At the outset we may reject the idea that liability of Ryan Firm in its role as trustee can be predicated on *Troy's* allegedly oppressive interpretation of the loan documents. The result in *Kachlon* is impossible to square with that idea. The malice of the beneficiary is not attributed to the trustee. (*Kachlon, supra*, 168 Cal.App.4th at pp. 342-345.)

---

[14] Here is the text, verbatim:
"(b) In performing acts required by this article, the trustee shall incur no liability for any good faith error resulting from reliance on *information provided in good faith by the beneficiary* regarding the nature and the amount of the default under the secured obligation, deed of trust, or mortgage. In performing the acts required by this article, a trustee shall not be subject to Title 1.6c (commencing with Section 1788) of Part 4."

We may further note, in passing, that if *Garretson* is ultimately found to be correct, the absolute litigation privilege applies to trustees in the context of their duties in nonjudicial foreclosure (the defendant in *Garretson* was not a trustee, but a lender), the effect is to sweep the table of all of Domingo Villas' claims against Ryan Firm by virtue of the absolute privilege.

However, proceeding on the assumption that *Kachlon* better states the existing law – Ryan Firm in its role as trustee may claim only a qualified privilege which allows for a malice exception – it is still the case that Domingo Villas cannot prevail on any of its claims. In an anti-SLAPP motion, once a defendant passes step one, the burden then shifts to the plaintiff to show minimal merit. (See *Peregrine Funding, supra*, 133 Cal.App.4th at p. 675 and p. 675, fn. 10.) And Domingo Villas did not carry that burden.

A plaintiff in an anti-SLAPP motion cannot rely on just its pleadings to establish some critical point of a claim. Something more is needed. (E.g., *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 735 ["a plaintiff cannot simply rely on his or her pleadings, even if verified. Rather, the plaintiff must adduce competent, admissible evidence"]; *Cabrera v. Alam* (2011) 197 Cal.App.4th 1077 [some real evidence of malice needed to show malice in defamation against limited public figure].)

The rule is especially important when it comes to allegations of maliciousness. A conclusory assertion that certain conduct is malicious is not enough to withstand even a demurrer (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 649) much less an anti-SLAPP motion. There must at least be enough facts to show a prima facie case of actual malice. (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1578-1579.)

So what exactly do we have in the case before us to show that Ryan Firm acted maliciously *in its role as trustee*? The answer is nothing. Domingo Villas' opposition to Ryan Firm's anti-SLAPP motion was supported by Chamberlain's declaration, which – as is painfully obvious when one reads it – is nothing more than a

19

retelling of the second amended complaint, right down to a chronological ordering which omits Ryan Firm's role in the preparation of a judicial foreclosure action and obscures Ryan Firm's relatively late arrival on the scene.[15]  Like the second amended complaint, the only evidence of malice in Chamberlain's declaration is to be found in Ryan Firm's *interpretation* of the loan documents.  The basic story-line of both the second amended complaint and Chamberlain's declaration is simply that Ryan Firm got the bright idea of denying Domingo Villas credit for Chamberlain's payments out of sheer, unreasonable mean-spirited zealotry on behalf of its client, and therefore malice is shown.[16]

Not so.  At the spot in its brief where one would most expect to find a development of the theory that Ryan Firm's interpretation of the Extension Agreement is so bad that malice can be inferred, no such attempt is made.  Domingo Villas merely argues that the parties' dispute over interpretation simply evidences the absence of protected activity (step one), and makes no effort to show how the interpretation might somehow give rise to an inference of malice (step two).

Moreover, whatever the other merits of this loan dispute, the story-line of mean-spirited cut-from-whole-cloth nastiness in not crediting Domingo Villas for Chamberlain's payments is belied by the actual text of the Extension Agreement itself.  A number of aspects of the agreement show Ryan Firm's interpretation to be reasonable enough that the interpretation itself cannot support any inference of malice.

---

[15]     Chamberlain's declaration reads like its author had the second amended complaint in front of him as he was dictating the text of the declaration, and was simply repeating its statements, including conclusions of law. Ryan Firm is quite correct to note this court condemned the process of making legal argument in a declaration in *In re Marriage of Heggie* (2002) 99 Cal.App.4th 28, 30, fn. 3 ["Even at its most benign, it is a practice that forces the trial and appellate courts, and opposing counsel, to sort out the facts that are actually supported by oath from material that is nothing more than the statement of an opinion ostensibly under oath.  More fundamentally, however, it makes a mockery of the requirement that declarations be supported by statements made under penalty of perjury. The proper place for argument is in points and authorities, not declarations."].)

[16]     Indeed, at oral argument, counsel for Domingo Villas admitted that the only evidence he had of malice on Ryan Firm's part was the sheer size of the outstanding balance.  But that size, however, was the product of Ryan Firm's interpretation of the Extension Agreement, not some number pulled maliciously out of thin air.

20

First, though you wouldn't know it from the second amended complaint, the Extension Agreement does not even include Domingo Villas. If Chamberlain and Troy had agreed that Domingo Villas was to get credit for the payments Chamberlain promised he would make, it would have been logical to have at least included Domingo Villas as a party, or plainly say it was a third-party beneficiary of the agreement. Second, the agreement contemplates a nonjudicial foreclosure sale which, because of its provisions for a full credit bid, would eliminate Chamberlain's exposure to a deficiency judgment in the wake of the foreclosure. Because the property is *commercial* property, Chamberlain's exposure to such a deficiency judgment would have been a factor in any deal he made with Troy. Paying something to Troy to eliminate that risk indicates at the very least Chamberlain was getting something for his money independent of whatever effect that money would have on Domingo Villas' outstanding balance. Third, the agreement contemplated a resale to Chamberlain at what might be a very good price indeed: a mere $1.5 million. The $1.5 million figure has significance given the property's eventual sale in the bankruptcy courts for $2.9 million. That's quite a lot of room for Chamberlain to make a profit. Again, the import is that Chamberlain was paying for something which was not necessarily linked to the Domingo Villas' balance, namely the prospect of a bargain *after* foreclosure had been completed, plus escape from the prospect of a deficiency judgment then hanging over him. Fourth, there was the prospect of a *refund* of all of $100,000 payments which Chamberlain was to make under the agreement if a third party bid more for the property than did Troy. In that respect the $100,000 payments do not seem intended to pay down Domingo Villas' loan balance at all, but to give Chamberlain, in his personal capacity, a valuable option to reorganize the property and begin afresh.

We are not saying that these considerations show the correct result, and in no way wish to prejudice the trial court on that point when the matter returns. Maybe Chamberlain's payments *were* intended to pay down the loan balance. But what we do

21

say is that if the only evidence of maliciousness is the position taken in litigation by Troy under advisement of Ryan Firm that Domingo Villas is not to receive credit for Chamberlain's payments, that is not enough to show malice on Ryan Firm's part.  And without malice, the qualified common interest privilege obviates all claims against Ryan Firm *as trustee*.

## IV.  DISPOSITION

The order denying Ryan Firm's anti-SLAPP motion is reversed.  The trial court is directed to enter a new order granting the motion and to enter judgment in favor of Ryan Firm.  Ryan Firm is to recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


THOMPSON, J.


22